**United States District Court**
For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
7
8   CHARLES P. SULLIVAN,                  No. C-06-2725 (MHP) (pr)
9              Plaintiff,
10        v.                              **ORDER DENYING PETITIONER'S
                                          PETITION FOR WRIT OF HABEAS
11  ROSANNE CAMPBELL, Warden,             CORPUS**
12             Respondent.
    _____/
13
14
15        This is a habeas case filed by a state prisoner, Charles P. Sullivan, pursuant to 28 U.S.C. §

16  2254.  Sullivan was convicted by a jury in Santa Clara County of six counts of aggravated sexual

17  assault (Cal. Pen. Code § 269), and one count of forcible lewd or lascivious acts on a child (*id.* §

18  288(b)(1)).  *See* Ex. A (CT 283-89).  He was sentenced to 15 years to life for each count of

19  aggravated sexual assault and 6 years for the remaining count.  The trial court ran all the sentences

20  consecutive pursuant to California Penal Code § 667.6(d), thus yielding a total sentence of 96 years

21  to life.  *See* Ex. B (RT 646-47).

22        As grounds for habeas relief, Sullivan argues that (1) the admission of propensity evidence

23  violated his right to due process; (2) the use of the 1999 version of CALJIC No. 2.50.01 violated his

24  right to due process; (3) the trial court's denial of a continuance violated his right to due process as

25  well as his right to confront prosecution witnesses and right to have compulsory process to obtain

26  his own witnesses; (4) his trial counsel rendered ineffective assistance; (5) the  trial court's failure to

27  conduct any inquiry into his dissatisfaction with his sentencing counsel violated his right to

28  competent counsel and his automatic right to discharge retained counsel; (6) his sentencing counsel

**United States District Court**

For the Northern District of California

rendered ineffective assistance; and (7) mandatory consecutive sentencing may not be imposed under California Penal Code § 667.6(d) because the finding of separate occasions was not made by a jury and found beyond a reasonable doubt as required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny.  Having reviewed the parties' briefs and accompanying submissions, the Court hereby **DENIES** the petition.

## I.   FACTUAL & PROCEDURAL BACKGROUND

On November 17, 2000, Sullivan was charged in an information with six counts of aggravated sexual assault (Cal. Pen. Code § 269), and one count of forcible lewd or lascivious acts on a child (*id.* § 288(b)(1)).  *See* Ex. A (CT 283-89).  The evidence presented at Sullivan's trial is discussed in the state appellate court's opinion of April 2, 2003, *see* Ex. G (Order), and reflected in the Reporter's Transcript ("RT").  *See* Ex. B (RT).  To wit, at trial, Serena -- nine years old and in the fourth grade at the time, *see id.* (RT 10) -- testified that her father, Sullivan, had touched her vagina and bottom.  He used his penis, hands, and mouth to touch her vagina.  He put his penis in her vagina more than five times, touched her vagina with his fingers more than five times, and put his mouth on her vagina more than five times.  *See id.* (RT 18-19, 23, 28-29, 32-33).  Sullivan also put his penis in Serena's mouth more than five times.  *See id.* (RT 29).  Serena saw sperm come out of Sullivan's penis.  Sperm got onto her vagina and sometimes into her mouth.  *See id.* (RT 31).  The sperm tasted gross to Serena.  *See id.* (RT 31).  Sometimes Sullivan ate his own sperm.  *See id.* (RT 30).

The first time Sullivan touched Serena was in the first or second grade.  The touchings happened thereafter about once or twice a week during the second and third grade.  *See id.* (RT 19, 34, 36).  The touchings typically took place in Sullivan's bedroom, although one time an incident took place in Serena's bedroom.  *See id.* (RT 19, 22).  Serena asked her father to stop the touchings.  Sometimes he would say that this is the last time, but it never was.  Other times he told Serena to be quiet or he just ignored her.  *See id.* (RT 24).  Serena also tried to get away from the touchings but he would just pull her back; she was never able to get away.  *See id.* (RT 24-25).

Serena did not tell anyone about the touchings during the second grade because her father instructed her not to; he also said that, if she told anyone, he would get in trouble and go to jail.  *See*

**United States District Court**
For the Northern District of California

*id.* (RT 37).  In the third grade, however, Serena did tell her friend Chelsea about the touchings.  *See id.* (RT 37-38).  According to Serena, she told Chelsea while they were making a tent with a blanket at Chelsea's house.  *See id.* (RT 46).  In subsequent testimony, Chelsea confirmed that Serena told her about the touchings but claimed that Serena told her about the touchings while they were at Serena's house watching a movie.  *See id.* (RT 355-57).  According to Serena, she did not tell any adult about the touchings until April 2000 when she finally told her mother, Michele Vogtman.  *See id.* (RT 38-41).  At the time that Serena told her mother about the touchings, Serena knew -- based on information previously provided by her mother -- that Sullivan had touched Elizabeth, Serena's half-sister.  *See id.* (RT 59-60, 74, 98).  Ms. Vogtman immediately took Serena to the hospital where Serena talked to a policeman.  *See id.* (RT 40-41).

Serena testified that no one had told her to say that her father had molested her.  *See id.* (RT 116).  Serena admitted that, in the past, she had lied before -- more specifically, that she had forged her father's signature for a school paper (a reading log).  Serena stated that she had signed his name because she had forgotten to show the reading log to him.  *See id.* (RT 69-70).

Elizabeth, Serena's half-sister, also testified at trial.  At the time of trial, Elizabeth was thirteen and in the eighth grade.  *See id.* (RT 145).  In her testimony, Elizabeth stated that, when she was about five years old, she was scratching her vagina because it was itchy.  Sullivan took her to the bathroom, pulled down her pants, and rubbed lotion on her vagina.  His hand was over her hand and was rubbing the lotion on her vagina.  He did not put his finger up her vagina.  However, afterward, Sullivan went into his bedroom and masturbated by rubbing the lotion on his penis.  *See id.* (RT 150-55).  Elizabeth told her mother, Ms. Vogtman, what had happened and Ms. Vogtman took Elizabeth to the police.  *See id.* (RT 157).

Ms. Vogtman subsequently testified at trial.  During her testimony, she stated that she had been married to Sullivan for approximately five years, during which time they had two daughters, the elder of which was Serena.  *See id.* (RT 179-80).  She stated that Sullivan used to eat his own semen.  *See id.* (RT 202). One time, when Elizabeth, Serena's half-sister, was about five or six years old, Elizabeth told her that Sullivan had touched her vagina, more specifically, that he had put his finger in her vagina.  *See id.* (RT 181-82).  Ms. Vogtman immediately took Elizabeth to the police

3

who then took her to the hospital to be examined. Ms. Vogtman called Sullivan and told him what Elizabeth had said; he denied doing anything and said that Elizabeth had been touching herself, that he thought she had a rash, and that he showed her how to put lotion there. *See id.* (RT 184). Eventually, Ms. Vogtman returned to the house she shared with Sullivan, bringing Elizabeth with her, because, even though she believed Elizabeth, the examination revealed that Elizabeth's hymen was not broken,[1] and so she thought (at the time) that Elizabeth might have misunderstood Sullivan's actions. *See id.* (RT 185). After the incident, however, she did not leave Elizabeth alone with Sullivan. She was not concerned about Serena and her other daughter, Ciera, because they were Sullivan's biological children. *See id.* (RT 187). When Ms. Vogtman and Sullivan divorced, she took Elizabeth with her and agreed to give Sullivan physical custody of Serena and Ciera. *See id.* (RT 189).

Ms. Vogtman further testified that, after the divorce, she made several police reports regarding Sullivan's treatment of their daughters. In October 1995, she called the police to report bruising on the girls. *See id.* (RT 192). In September 1998, she told the police that Sullivan had been hitting the girls with a flyswatter. *See id.* (RT 192-93). In October 1999, she reported that Ciera had been sleeping naked with Sullivan.[2] *See id.* (RT 194).

Subsequently, in April 2000, Serena told Ms. Vogtman that Sullivan had touched her. *See id.* (RT 195). According to Ms. Vogtman, she was alone in her boyfriend's bedroom with Serena when Serena asked her why she had left Sullivan. Ms. Vogtman told her it was because Sullivan had touched Elizabeth inappropriately. She did not give Serena any other details about what had happened to Elizabeth and, prior to that date, she had not talked to Serena about what had happened to Elizabeth. *See id.* (RT 198-200). Serena said that she felt dizzy and nauseous, so Ms. Vogtman took her outside to get fresh air. Then Serena told her mother that Sullivan had touched her on the vagina and bottom. *See id.* (RT 198-99). Ms. Vogtman immediately took Serena to the hospital.

---

[1] In subsequent testimony, Suzanne Frank, a physician, testified that she had examined Elizabeth at or about the time of the incident, that Elizabeth said that Sullivan had put his finger in her vagina, and that she and found no evidence of penetrating trauma. *See* Ex. B (RT 378, 380-81).

[2] In January 1996, Ms. Vogtman also called Child Protective Services about a rash on Ciera in her vaginal area. *See* Ex. B (RT 227).

United States District Court
For the Northern District of California

1   *See id.* (RT 200).  Serena was examined at the hospital.  Ms. Vogtman was in the examination room

2   with Serena, but then the medical staff was trying to give Serena a shot and she was having a hard

3   time, so Ms. Vogtman was asked to leave.  *See id.* (RT 242-43).

4   According to Ms. Vogtman, she did not tell Serena to say any of the things about what

5   Sullivan had done to her.  *See id.* (RT 250-51).

6   After Ms. Vogtman testified, several medical experts provided testimony.  Sharon Crowley, a

7   registered nurse and forensic clinical nurse specialist, testified that she examined Serena on the day

8   that she was taken to the hospital by Ms. Vogtman.  *See id.* (RT 264, 272).  Initially, Ms. Vogtman

9   was in the exam room.  However, she left upon Ms. Crowley's request.  Ms. Crowley felt that Ms.

10  Vogtman's presence would disrupt Serena.  Ms. Vogtman was upset and yelling at the officers; Ms.

11  Crowley was informed by a nurse who was assisting her (Esparanza Rojas) that Ms. Vogtman was

12  upsetting Serena more.  *See id.* (RT 279-80).

13  During the examination, Ms. Crowley did not observe any obvious physical injuries to

14  Serena's genital or anal area.  There was no evidence of acute or recent injury or trauma.  There

15  were no tears, abrasions, areas of swelling, or redness.  *See id.* (RT 283, 285).  The absence of

16  physical injury was not inconsistent with what had allegedly happened to Serena -- *i.e.*, digital

17  penetration, penile penetration of the vagina, sodomy, and oral copulation.  According to Ms.

18  Crowley, most children she examines have normal exams.  *See id.* (RT 287).  Considerably less than

19  half the children have physical findings.  *See id.* (RT 291).  Reasons for the absence of physical

20  injury include the fact that the genital area heals quickly.  The only injury likely to be seen after a

21  lapse of time is a tear in the hymen.  *See id.* (RT 288-89).

22  David Kerns, a physician, also testified.  He stated that, in his experience, the lack of

23  physical findings when there is an allegation of penile penetration on a young girl "certainly

24  occurs."  *Id.* (RT 332) (stating that there is definite evidence of penetration in 17% and suggestive

25  evidence in another 10%).  In studies where the perpetrator confessed to penile vaginal penetration,

26  one out of five victims had a normal exam.  *See id.* (RT 334).  For penile anal penetration, 80% had

27  a normal exam, and for digital penetration 60%.  *See id.*  Dr. Kerns stated that it is rare to see an

28  injury of the vagina itself, even in a child, and, while the hymen can be damaged, it can repair itself

United States District Court

For the Northern District of California

1  so that it may appear normal; in addition, it can vary from person to person as to how must stress is

2  required to break a hymen.  *See id.* (RT 335-37).

3       Following the expert testimony, several police officers and a social services investigator

4  testified.  Richard Granado, a San Jose police officer, testified that, in April 2000, he was at the

5  hospital where Ms. Vogtman had taken Serena after being told about the molestation by Sullivan.

6  Serena told Officer Granado that the last sexual interaction -- which had included forced oral

7  copulation and digital penetration of the vagina -- had taken place on that day, in the late morning.

8  Serena also stated that the last penile penetration (both vaginal and anal) was one week earlier.  *See*

9  *id.* (RT 429, 432-34).

10       Officer Carie Shigemasa-Diaz, another San Jose police officer, testified that she spoke with

11  Serena twice.  The first time was during an interview that took place the day after the incident was

12  reported.  Officer Shigemasa-Diaz conducted the interview at the Children's Interview Center, and

13  Sallie Bearden, a social worker, observed the interview in an adjacent room.  According to the

14  officer, Serena answered questions about the molestation without hesitation.  *See id.* (RT 409-11).

15  The second time that Officer Shigemasa-Diaz saw Serena was when the police arranged for a

16  "pretext call" between Serena and Sullivan.  Officer Shigemasa-Diaz listened to the telephone call

17  between the two (Sullivan did not know that the officer was listening) and gave Serena guidance as

18  to how to answer some of the questions that Sullivan asked.  *See id.* (RT 411-13).  During the call,

19  Sullivan denied doing anything to Serena.  Serena became very emotional, started to cry, and

20  repeatedly apologized to her father.  *See id.* (RT 413-14).  According to the officer, "[t]he whole

21  conversation in a nutshell was that she was sorry, that she's telling the truth and she doesn't want

22  him to go to jail, but if he tells the truth, you know, may be [sic] he won't go to jail."  *Id.* (RT 415).

23  After the conversation ended, Serena continued to cry.  *See id.*

24       Subsequently, Officer Shigemasa-Diaz interviewed Sullivan himself directly.  She discussed

25  with him the allegations that had been made previously by Elizabeth.  Sullivan told the officer that

26  Elizabeth had been masturbating at the house, that she replied that she was itchy, that he gave her

27  lotion to apply to herself, that he waited for her to do so while he smoked a cigarette facing the

28

opposite direction, and that she never did so. *See id.* (RT 416-17). Sullivan also told the officer that Serena was a trustworthy child. *See id.* (RT 417).

Sallie Bearden, a dependency investigator for the Department of Family and Children Services, confirmed in her testimony that she observed the first interview that Officer Shigemasa-Diaz conducted with Serena. *See id.* (RT 255, 258). Ms. Bearden also observed the pretext call that Serena made to Sullivan. *See id.* (RT 364). According to Ms. Bearden, Serena was very upset after the telephone call -- more specifically, she was sobbing for approximately fifteen minutes and then continued to be upset for at least two hours. *See id.* (RT 365). Serena said that Sullivan told her she would never see him again, that it was her fault that he was going to have to go to trial, and that she would be put in a home for adoption and never see her sister again. Serena also said that she wanted to see Sullivan and ask him why he would not tell the truth. *See id.*

Ms. Bearden further testified that she had spoken to Sullivan. *See id.* (RT 261). According to Ms. Bearden, Sullivan told her about the prior incident involving Elizabeth. Sullivan said that he had been in a fast food restaurant with Elizabeth and was embarrassed because she was masturbating constantly. He took her home and told her to rub Vaseline there because he was tired of seeing her masturbate so publicly. He did not rub the Vaseline on Elizabeth directly but rather just instructed her as to what to do. *See id.* (RT 373-74). Sullivan also told Ms. Bearden that Serena was very honest, very sincere, genuine, and trustworthy. *See id.* (RT 374).

Finally, Charles Gould, a San Jose police officer, testified about the investigation that he conducted with respect to the prior incident involving Elizabeth. *See id.* (RT 400-01). Sullivan told Officer Gould that he had been shopping with Elizabeth at the grocery store when it was brought to his attention by some female shoppers that Elizabeth was masturbating. When Sullivan and Elizabeth returned to the house, he learned that her complaint was of vaginal itching so he had her rub lotion in that area. Sullivan said that Elizabeth was not as successful as he wanted her to be in the application of it so he put his hand on hers and rubbed the lotion into the vagina area. *See id.* (RT 406-07). Officer Gould also testified that, at some point after Ms. Vogtman had first contacted the police about the incident involving Elizabeth, she talked to the police again and expressed her

United States District Court

For the Northern District of California

1  feeling that there was a miscommunication between Elizabeth, Sullivan, and herself.  Ms. Vogtman

2  had talked to Elizabeth again and Elizabeth had changed her story.  *See id.* (RT 405-06).

3       After the above witnesses testified, the defense presented its case.  Esparanza Rojas, a nurse

4  who assisted Ms. Crowley during her examination of Serena, testified first.  She stated that she did

5  not recall any prompting of Serena by Ms. Vogtman.  *See id.* (RT 463-64, 466).  However,

6  subsequently, a stipulation was read to the jury that stated as follows: "The mother became

7  extremely agitated during the time here and actually had to be excused from the exam room because

8  she was yelling at the officers.  And it was felt that she was disruptive to the child.  Esparanza Rojas,

9  LVN, witnessed the mother prompting the child and became concerned about this.  Esparanza

10  informed Officer Granado of this."  *Id.* (RT 527).

11      Christina Thomas, a San Jose police officer, testified next.  She stated that, in October 1995,

12  she investigated a report by Ms. Vogtman that there was bruising on her daughters.  Officer Thomas

13  looked at Serena's back but did not see any bruising.  She did see some small bruises on Serena's

14  hips.  *See id.* (RT 522).

15      Finally, Elizabeth Lasek, a nurse and neighbor of Sullivan, testified.  She would see Serena

16  and her sister Ciera almost every day when they would stop by her house after their father had

17  picked them up from the babysitter or school.  *See id.* (RT 530).  Ms. Lasek did not think that Ms.

18  Vogtman was a very good mother.  *See id.* (RT 533).  She did not think highly of Ms. Vogtman but

19  she did think highly of Sullivan.  *See id.* (RT 540).

20      After Ms. Lasek's testimony, there was a recess in the trial until approximately 10:30 a.m.

21  *See id.* (RT 542).  Upon reconvening, the trial court informed the jury that there were some

22  scheduling problems and therefore it would hold a recess until approximately 1:30 p.m.  *See id.* (RT

23  543).  Upon return from this recess, trial counsel for Sullivan, Scott Christenson, informed the Court

24  that he had no further witnesses available at the time.  *See id.* (RT 544).  Christenson indicated that

25  there were still three additional witnesses from whom he wished to elicit testimony: Ms. Vogtman,

26  Joy Taharo, and Edith Peyghambary.

27      According to Christenson, he had not been able to reach Ms. Vogtman for recall.  *See id.* (RT

28  544).  As to Joy, Serena's cousin on her father's side, she was a dependent of the court and

8

United States District Court

For the Northern District of California

Christenson had had difficulty with serving a subpoena on her.  Apparently, he had tried to have the subpoena served on the kinship center that was taking care of Joy but was unable to do so.  That morning, he had finally managed to have the Department of Social Services served with the subpoena.  *See id.*  Over the lunch hour, Christenson had talked to the social worker about the subpoena.  The social worker did not say that Joy would be unavailable but did say that she would be getting an attorney involved.  *See id.* (RT 544-45).  The social worker also said that, within an hour, she was willing to tell him about the possibility of talking to Joy that afternoon.  *See id.* (RT 546).

Finally, the admissibility of Ms. Peyghambary's testimony depended on Joy's testimony.  Ms. Peyghambary would testify to impeach Joy, if necessary.  According to Ms. Peyghambary,[3] she repeatedly asked Joy if she had been touched by Sullivan (Joy's uncle) and Joy said that she had not been.  Joy told Ms. Peyghambary that Ms. Vogtman had asked Joy to say that she was aware of the fact that Sullivan had been touching Serena but Joy was not willing to make that statement.  *See id.* (RT 545).

Because of the unavailability of the three witnesses, Christenson asked the trial court for a continuance.  The trial court denied the request, stating that the issue regarding Joy

> should have been brought to the attention of Michele Vogtman when she was on the witness stand to allow her to explain or deny under [California] Evidence Code 770 so that you might ask Joy Taharo regarding what the Court believes is a prior inconsistent statement. . . .
>
> So Michele Vogtman is not present and apparently you've been unable to contact Michele Vogtman, Christenson.  And you have not been able to produce Joy Taharo let alone speak with her prior to this time.  The Court has been in recess basically since 10:15 and it's now two o'clock.  I'm uncomfortable with this delay.
>
> I have no desire to prejudice the defendant in this case, but I'm very concerned about the jurors.  And I can tell you in judging their reactions to the Court's continuances in this matter, they are growing impatient with the Court's delays.

---

[3] The state appellate court's opinion describes Ms. Peyghambary as the "after school-provider" for Serena and her sister Ciera after Sullivan and Ms. Vogtman divorced and as their "temporary foster parent."  Ex. G (Order at 20).  Ms. Peyghambary apparently cared for Joy as well when she temporarily lived with Sullivan.  *See id.*

United States District Court
For the Northern District of California

> I believe as [the prosecutor] has pointed out that these are issues that should have been dealt with long ago. Subpoenas should have been served long ago. A tighter rein obviously should have been placed on Michele Vogtman. And I simply am not at this point willing to grant any further continuances.

*Id.* (RT 548). Subsequently, the trial court conceded that Christenson was correct that Ms. Vogtman had not been excused as a witness and therefore California Evidence Code § 770 was not a bar to her testimony. *See id.* (RT 550).

> But the difficulty we still have is that Joy Taharo is not present and we don't have any idea when Joy Taharo is going to be here or whether she will make herself unavailable to the Court. You indicated both her foster parent and an attorney would likely resist her testimony or may resist her testimony in the court.
>
> This is going to take an unreasonable period of time, and the Court simply is not willing to grant any further delays in this matter.

*Id.* (RT 550-51). The trial court stated that it would invite the jury back into the courtroom in ten minutes -- *i.e.*, at 2:15 p.m. -- and, if defense counsel did not have any further witnesses at that point, it would ask counsel to rest his case. *See id.* (RT 551). Thus, altogether, the trial court had held a recess for almost four hours (*i.e.*, from 10:30 a.m. to 2:15 p.m.).

When the jury returned, Christenson rested his case. The trial court then recessed proceedings until 11:00 a.m. the next day, at which time it would give the jury the final instructions and then allow for closing arguments. *See id.* (RT 552). After the jury received the case and deliberated for several days, it rendered a verdict of guilty on all seven counts.

Sentencing took place several months later, at which point Sullivan was represented by new counsel, Jerome Mullin. Mullin moved for a new trial based on the trial court's refusal to allow a defense expert to testify. *See id.* (RT 643). The trial court denied the motion, *see id.* (RT 644), and then proceeded to sentencing. The court stated that it would follow the recommendation of the Probation Department and imposed a sentence of 15 years to life for each count of aggravated sexual assault and 6 years for the remaining count. The trial court stated that the sentences would run consecutively pursuant to California Penal Code § 667.6(d). *See id.* (RT 646-47). Under that statute,

**United States District Court**
For the Northern District of California

1
2

> A full, separate, and consecutive term shall be served imposed for each violation of an offense . . . if the crimes involve separate victims or involve the same victim on separate occasions.

3
4
5
6
7

> In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions.

8 Cal. Pen. Code § 667.6(d).

9  Subsequently, Sullivan appealed his conviction and sentence on various grounds.  He also

10 filed a petition for habeas corpus in state court.  In both the appeal and habeas petition, Sullivan

11 claimed ineffective assistance of counsel, by trial counsel as well as sentencing counsel.  The state

12 appellate court affirmed the conviction and denied the petition but reversed and remanded for

13 resentencing because the trial court had failed to state any reasons for imposing fully consecutive

14 sentences pursuant to § 667.6(d).  *See* Ex. G (Order).  The California Supreme Court denied review.

15 *See* Ex. I (Order).

16  At resentencing, Mullin appeared to represent Sullivan.  The trial court reaffirmed that the

17 sentences would run consecutively pursuant to § 667.6(d), stating as follows: "[T]he fact that these

18 actions clearly occurred over a significant two year period of time, and the Court having heard the

19 testimony in this case, and believing, in fact, that the defendant did have the opportunity to reflect on

20 his actions and nevertheless on many separate occasions resumed his sexually assaultive behavior,

21 the Court believes that this case comes squarely within the meaning of Penal Code Section

22 667.6(d)."  Ex. K (RT 7).

23  Sullivan appealed the sentencing but the sentence was affirmed by the state appellate court

24 on December 2, 2004.  *See* Ex. O (order).  Sullivan's petition for rehearing was denied, *see* Ex. Q

25 (Order), and then the California Supreme Court denied review.  *See* Ex. S (Order).  Sullivan

26 subsequently filed his petition for habeas relief in this Court.

27

28

**United States District Court**
For the Northern District of California

## II.   <u>DISCUSSION</u>

A.   <u>Legal Standard</u>

This Court is required to analyze state habeas corpus claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, a court may entertain a petition for writ of habeas corpus "[on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  *See LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  The state court's decision is to be evaluated under a "highly deferential" standard of review.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curium).  A state court decision is "contrary" to Supreme Court authority if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A state court decision is an "unreasonable application of" Supreme Court authority if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  A district court "may not issue [a] writ [of habeas corpus] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411; *see also Lockyard v. Andrade*, 538 U.S. 63, 75 (2003) (noting that a

12

United States District Court

For the Northern District of California

1  decision challenged as an unreasonable application of Supreme Court law must not merely be

2  erroneous, but "objectively unreasonable").

3        As noted above, Sullivan argues that he is entitled to habeas relief for the following reasons:

4  because (1) the admission of propensity evidence violated his right to due process; (2) the use of the

5  1999 version of CALJIC No. 2.50.01 violated his right to due process; (3) the trial court's denial of a

6  continuance violated his right to due process as well as his right to confront prosecution witnesses

7  and right to have compulsory process to obtain his own witnesses; (4) his trial counsel rendered

8  ineffective assistance; (5) the trial court's failure to conduct any inquiry into his dissatisfaction with

9  his sentencing counsel violated his right to competent counsel and his automatic right to discharge

10  retained counsel; (6) his sentencing counsel rendered ineffective assistance; and (7) mandatory

11  consecutive sentencing may not be imposed under California Penal Code § 667.6(d) because the

12  finding of separate occasions was not made by a jury and found beyond a reasonable doubt as

13  required by *Apprendi*, 530 U.S. at 466, and its progeny.  The Court addresses each argument in turn.

14  B.    Admission of Propensity Evidence

15        Sullivan argues first that he is entitled to habeas relief because his due process rights were

16  violated when the trial court improperly admitted propensity evidence -- *i.e.*, the uncharged prior

17  sexual assault against Elizabeth.  The Court does not agree.  Habeas relief is available only when the

18  state court's adjudication resulted in a decision that was contrary to, or involved an unreasonable

19  application of, clearly established federal law, as determined by the Supreme Court.  *See* 28 U.S.C. §

20  2254(d).  As the Ninth Circuit has noted,

21          the Supreme Court has never expressly held that it violates due
        process to admit other crimes evidence for the purpose of showing

22          conduct in conformity therewith, or that it violates due process to
        admit other crimes evidence for other purposes without an instruction

23          limiting the jury's consideration of the evidence to such purposes.
        Indeed, the Supreme Court has expressly declined to answer these

24          questions.

25  *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 75

26  n.5 (1991) ("express[ing] no opinion on whether a state law would violate the Due Process Clause if

27  it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"),

28  *overruled on other grounds by* 538 U.S. 202 (2003).

United States District Court

For the Northern District of California

1    Because the Supreme Court has expressly declined to answer these questions, this Court

2    cannot say that, in the instant case, the state appellate court acted in an objectively unreasonable

3    manner in concluding that the admission of evidence related to Elizabeth did not violate due process.

4    *See Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (stating that, "[b]ecause the

5    [Supreme] Court has expressly left this issue an open question, the state court did not unreasonably

6    apply clearly established federal law in determining that the admission of evidence of Larson's

7    criminal history did not violate due process"); *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir.

8    2006) (stating that "[w]e cannot conclude that the Nevada Supreme Court acted in an objectively

9    unreasonable manner in concluding that the propensity evidence introduced against Alberni did not

10   violate due process, given that *Estelle* expressly left this issue an 'open question'"); *see also Cata v.*

11   *Garcia*, No. C 03-3096 PJH (PR), 2007 WL 2255224, at *13 (N.D. Cal. Aug. 3, 2007) (stating that

12   "petitioner has not shown that the court of appeal's rejection of his due process claim was contrary

13   to or an unreasonable application of 'clearly established Federal law, as determined by the Supreme

14   Court of the United States'"); *Darn v. Knowles*, No. C 02-2892 SI (PR), 2003 WL 21148412, at *10

15   (N.D. Cal. May 14, 2003) (concluding the same).

16        Even if there were clearly established Supreme Court precedent, Sullivan's due process

17   claim would still fail.  At Sullivan's trial, the trial court admitted the evidence relating to Elizabeth

18   under California Evidence Code § 1108, which provides that, "[i]n a criminal action in which the

19   defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual

20   offense or offenses is not made inadmissible by Section 1101 [which makes character evidence

21   inadmissible to prove conduct in conformity therewith], if the evidence is not inadmissible pursuant

22   to Section 352."  Cal. Evid. Code § 1108.  Section 352 in turn provides: "The court in its discretion

23   may exclude evidence if its probative value is substantially outweighed by the probability that its

24   admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue

25   prejudice, of confusing the issues, or of misleading the jury."  *Id.* § 352.

26        Other judges in this District have held, in the habeas context, that § 1108's allowance of

27   propensity evidence in the limited area of sex offense cases does not violate due process.  *See, e.g.,*

28

*Cata*, 2007 WL 2255224; *Darn*, 2003 WL 21148412.  In *Darn*, Judge Illston provided the following reasoning:

> No Ninth Circuit decision has yet directly addressed the constitutionality of § 1108.  However, § 1108 is analogous to Federal Rules of Evidence 413 and 414, which govern the admissibility of evidence of prior conduct in cases of sexual assault and child molestation.  All allow admission of evidence of prior bad acts -- sexual assaults under § 1108 and Rule 413, and molestations under Rule 414 -- in cases involving similar crimes.  The Ninth Circuit has rejected a due process challenge to Rule 414, and its reasoning guides this court's consideration of the similarly patterned California law for sexual assault cases.  Federal Rule of Evidence 414 states that "evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant."  [In *United States v. LeMay*, 260 F.3d 1018 (9th Cir.2001), the Ninth Circuit] determined that Rule 414 did not violate due process because Rule 403 (the federal analog to California Evidence Code § 352) functions as a filter, resulting in the exclusion of evidence that is so prejudicial as to deprive the defendant of his right to a fair trial.  In other words, the "application of Rule 403 to Rule 414 evidence eliminates the due process concerns posed by Rule 414."
>
> California Evidence Code § 1108 functions in an analogous fashion to Federal Rule of Evidence 414.  Section 1108 allows for the introduction of evidence of prior sexual offenses committed by a defendant accused of a sexual offense and is subject to § 352 which excludes unduly prejudicial evidence.  Like Rule 414, § 1108 does not pose a due process concern because the § 352 filter (the state analog to the Rule 403 filter) does not allow the admission of § 1108 evidence which is so prejudicial as to preclude the right to fair trial guaranteed by the Due Process Clause.  [The habeas petitioner] has not shown "that the traditional ban on propensity evidence involves a 'fundamental conception of justice'" which is violated by § 1108.  He thus has not shown that § 1108's allowance of propensity evidence in the limited area of sex offense cases violates due process.

*Id.* at *9.  In *Cata*, Judge Hamilton provided similar reasoning.  *See Cata*, 2007 WL 2255224, at *12.  The Court finds the reasoning of Judges Illston and Hamilton persuasive and therefore rejects Sullivan's contention that § 1108 on its face violates due process.

Sullivan argues still that, as applied in his case, § 1108 was a violation of due process.  That is, according to Sullivan, the prior sexual offense related to Elizabeth was unduly prejudicial and therefore should have been excluded.  But a federal court cannot disturb on due process grounds a state court's decision to admit evidence of prior crimes or bad acts unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters*

United States District Court

For the Northern District of California

1   *v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  In *Walters*, the Ninth Circuit indicated that the

2   admission of evidence of a prior bad act does not render a trial fundamentally unfair if there is

3   sufficient proof that the petitioner committed the prior act, the prior act is not too remote in time, the

4   prior act is similar (if admitted to show intent), the prior act is used to prove a material element, and

5   the probative value is not substantially outweighed by prejudice.  *See id.*; *see also Harrington v.*

6   *Adams*, No. C 02-4850 PJH (PR), 2007 U.S. Dist. LEXIS 71656, at *15-16 (N.D. Cal. Sept. 17,

7   2007) (identifying the same factors).  *But cf. Garceau*, 275 F.3d at 775-76 (holding that an

8   instruction permitting the jury to consider prior crimes for purposes of establishing propensity

9   violated due process because the balance of the prosecution's case was not strong, the other crime

10  was the same crime for which the petitioner had been on trial, and evidence of the prior was

11  emotionally charged).

12          Taking into account the above factors, the admission of the evidence related to Elizabeth was

13  no so prejudicial that it rendered Sullivan's trial fundamentally unfair.  First, there was sufficient

14  proof that Sullivan committed the prior act involving Elizabeth.  At trial, Elizabeth testified that

15  Sullivan touched her vagina and that soon thereafter he masturbated.  Dr. Frank, the physician who

16  examined Elizabeth at or about the time of the incident, confirmed that Elizabeth said he had

17  touched her vagina.  Finally, Officer Gould, the police officer who investigated the incident

18  involving Elizabeth, testified that, when he spoke to Sullivan, Sullivan admitted to rubbing lotion on

19  Elizabeth's vaginal area.  Simply because Sullivan was not charged with, or convicted of, a sexual

20  offense because of the incident does not negate the above testimony presented at trial.

21          Second, the incident involving Elizabeth was not too remote in time.  There was only a five-

22  year lapse in time between the incident involving Elizabeth (in 1993) and the first touching of

23  Serena (in 1998, *i.e.*, when she was in second grade).  *See Lawrence v. Lockyer*, No. C 05-3541 SI

24  (pr), 2007 U.S. Dist. LEXIS 16225, at *26 (N.D. Cal. Feb. 22, 2007) (concluding that there was no

25  due process violation even though prior bad act evidence admitted; taking note of state court's

26  conclusion that a "6-8 year lapse in time between those [prior] incidents and the charged offenses"

27  was not too remote in time).

28

**United States District Court**
For the Northern District of California

Third, the prior act involving Elizabeth was especially probative in the instant case because some of the crimes with which Sullivan was charged required that there be a sexual intent to his acts. *See id.  See, e.g.*, Cal. Pen. Code § 269(a)(5) (providing that a person is guilty of aggravated assault of a child for sexual penetration in violation of California Penal Code § 289(a)); *id.* § 289(a) (making unlawful an act of sexual penetration when the act is accomplished against the victim's will by, *e.g.*, force; defining sexual penetration as the act of causing the penetration of the genital or anal opening of any person for the purpose of sexual arousal, gratification, or abuse by any foreign object);[4] Cal. Pen. Code § 288(b)(1) (providing that any person who commits a lewd or lascivious act upon or with the body, or any part or member thereof, of a child by use of, *e.g.*, force and with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child is guilty of a felony).  That Sullivan had a sexual intent when he, *e.g.*, digitally penetrated Serena's vagina was supported by the incident involving Elizabeth, during which Sullivan at the very least touched her vagina and later masturbated.

Sullivan suggests that the incident involving Elizabeth was not particularly probative because the Elizabeth and Serena incidents were not that similar.  *See* Ex. C (Pet.'s Br. at 24 (arguing that "[t]here is nothing unusual in a sex crime about one person touching another person's sexual parts with his or her finger").  However, as the state appellate court noted, there were significant similarities between the incidents in that both girls were quite young when assaulted, both lived in Sullivan's household at the time of the assaults, and Sullivan was in a parental relationship with both at the time of the assaults.  *See* Ex. G (Order at 10).  *Compare Hiskas v. Pliler*, No C 04-1891 VRW (PR), 2006 U.S. Dist. LEXIS 25811, at *23, 25-26 (N.D. Cal. Mar. 30, 2006) (finding no due process violation where, in both the prior and current offenses, the petitioner used an alias and befriended young girls who had problems at home, had sexual relationships with them, and led them into prostitution or was their pimp).

---

[4] *See also People v. Whitham*, 38 Cal. App. 4th 1282, 1293 (1995) (noting that the specific intent involved in foreign object penetration under § 289 "is a purpose of sexual arousal, gratification, or abuse").

**United States District Court**
For the Northern District of California

1   Fourth, the probative value of the evidence related to Elizabeth was not substantially

2   outweighed by prejudice.  While undoubtedly some prejudice flowed from the admission of the prior

3   act, the Court cannot say that that prejudice substantially outweighed the probative value of the

4   evidence, especially when the incident involving Elizabeth was no more inflammatory than the

5   incidents involving Serena.  In contrast to the incidents involving Serena, the incident involving

6   Elizabeth consisted of only one sexual act, not multiple sexual acts; moreover, the incident consisted

7   of at most digital penetration of the vagina.

8   Moreover, any prejudice was tempered by the trial court's jury instruction -- given

9   immediately before Elizabeth's testimony -- that

10  [i]f you find that the defendant committed a prior sexual offense, you
    may, but you are not required to, infer that the defendant had a
11  disposition to commit the same or similar type of sexual offense.

12  If you find that the defendant had this disposition, you may,
    but you are not required to, infer that he was likely to commit and did
13  commit the crimes of which he is accused in this trial.

14  However, if you find that the defendant committed a prior
    sexual offense, that is not sufficient by itself to prove beyond a
15  reasonable doubt that he committed the charged crimes.  The weight
    and significance of the evidence, if any, are for you to decide.

16

17  Ex. B (RT 144-55).  This "instruction did not state that [Sullivan] had in fact previously committed

18  acts of [sexual assault], or that if the jury found that he had, he was necessarily guilty of the charged

19  offense." *Cook v. McGrath*, No. C 03-2719 JSW (PR), 2006 U.S. Dist. LEXIS 64271, at *31 (N.D.

20  Cal. Aug. 28, 2006).

21  Finally, even without the evidence related to Elizabeth, the prosecution's case was strong.

22  Serena testified at length during the trial.  Although she did not provide exact dates and times for the

23  touchings, her testimony was specific and detailed -- *e.g.*, describing how Sullivan's sperm tasted

24  and how he sometimes ate his own sperm, *see* Ex. B (RT 30-31); describing a particular incident that

25  took place in her bedroom, *see id.* (RT 19, 22, 34); describing one incident that occurred in

26  Sullivan's bedroom when he and Serena were laying on their sides and he rubbed his penis between

27  her two legs, *see id.* (RT 111-12); and describing how she asked her father to stop the touchings and

28  how she tried to get away.  *See id.* (RT 24-25).  Serena's credibility was supported by Sullivan's

1    own statements (made to a police officer and a social worker) that she was a trustworthy and honest

2    child. *See id.* (RT 374, 417).  In addition, Serena had credibility because, long before she told her

3    mother about the touchings (which eventually led to the criminal charges against Sullivan), she had

4    told her friend Chelsea and, although, at trial, Serena and Chelsea had different recollections about

5    the circumstances under which Serena told Chelsea (*e.g.*, while making a tent or while watching a

6    movie), Chelsea confirmed that Serena had said her father was touching her.  *See id.* (RT 355-57).

7    Finally, Serena's credibility was supported by the fact that, as testified to by Officer Shigemasa-Diaz

8    and Ms. Bearden, during the pretext call she had with her father, she became very emotional and

9    even apologized to him but still maintained that she was telling the truth.  *See id.* (RT 365, 413-15).

10          Accordingly, Sullivan is not entitled to habeas relief based on the admission of the

11   propensity evidence related to Elizabeth.

12   C.    Use of CALJIC No. 2.50.01 (1999 Version)

13          Sullivan argues next that he is entitled to habeas relief because the use of the 1999 version of

14   CALJIC No. 2.50.01, which instructs the jury on how to consider the evidence of the prior sexual

15   assault, violated his constitutional right to due process and a fair trial.

16          The 1999 version of CALJIC No. 2.50.01, as given by the trial court in the instant case,

17   provides as follows:

18               Evidence has been introduced for the purpose of showing that
            the defendant engaged in the sexual offense [on one or more
19          occasions] other than that charged in the case.

20               . . . .

21               If you find that the defendant committed a prior sexual offense,
            you may, but are not required to, infer that the defendant had a
22          disposition to commit sexual offenses.  If you find that the defendant
            had this disposition, you may, but are not required to, infer that [he]
23          was likely to commit and did commit the crime [or crimes] of which
            [he] is accused.
24
                 However, if you find by a preponderance of the evidence that
25          the defendant committed a prior sexual offense, that is not sufficient
            itself to prove beyond a reasonable doubt that [he] committed the
26          charged crime[s].  The weight and significant of the evidence, if any,
            are for you to decide.

27

28

United States District Court

For the Northern District of California

1   Ex. A (CT at 221-22); *see also* Ex. B (RT at 144-45, 399-400, 562-63).  The jury was also given

2   standard instructions on "preponderance of the evidence" and "reasonable doubt," *see* Ex. B (RT at

3   565, 571) and was told to consider all of the instructions as a whole and in light of all of the other

4   instructions.  *See id.* (RT at 558).

5           According to Sullivan, the 1999 version of CALJIC No. 2.50.01 is unconstitutional because

6   it allows for the use of propensity evidence.  That argument is rejected for the reasons stated above.

7           Sullivan also argues that the 1999 version of the instruction is unconstitutional because it

8   allows a jury to convict a criminal defendant by a preponderance of the evidence rather than beyond

9   a reasonable doubt.  Citing *People v. Reliford*, 29 Cal. 4th 1007 (2003), which held that there was

10  "no constitutional error in the 1999 version of the instruction," *id.* at 1016, the state appellate court

11  rejected the argument.  The court noted:

12              Whether or not CALJIC No. 2.50.01 violates due process,[5]
            our jury was instructed with the 1999 revision to CALJIC No. 2.50.01
13          and with CALJIC No. 2.90 which instructs the jury that the
            prosecution must prove each element of the charged offenses beyond a
14          reasonable doubt.  In light of the instructions as a whole, which told
            the jury that it could consider the other crimes evidence only for a
15          limited purpose and that a finding on those crimes was not sufficient to
            prove the charged crimes beyond a reasonable doubt, there is no
16          reasonable likelihood that the jury could have misunderstood the
            instructions as [Sullivan] contends.

17

18  Ex. G (Order at 14-15).

19          The state court's decision was not objectively unreasonable and therefore habeas relief is not

20  appropriate.  Although the Ninth Circuit has expressly held that the pre-1999 version of CALJIC

21  2.50.01 unconstitutional, *see Gibson*, 387 F.3d at 832, it has not addressed the constitutionality of

22  the 1999 version in any published opinion.  Other judges in this District, however, have addressed

23  that very issue and have concluded that the 1999 version passes constitutional muster.  *See, e.g.,*

24  _____

25          [5] In *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), the Ninth Circuit held that the pre-1999
    version of CALJIC 2.50.01 and its companion instruction CALJIC 2.50.1 were unconstitutional because
26  they allowed a criminal defendant to be found guilty on a lower standard than beyond a reasonable
    doubt.  *See id.* at 822.  The pre-1999 version of CALJIC 2.50.01 states that a jury may, but is not
27  required to, infer from evidence of previous offenses that the defendant committed the crime with which
    he is charged, and 2.50.1 states that such previous offenses need be proved by a preponderance of the
28  evidence, not beyond a reasonable doubt.  Together, the instructions allowed a jury to convict based
    upon a preponderance of evidence rather than requiring proof beyond a reasonable doubt.  *See id.*

United States District Court

For the Northern District of California

1   *Cata*, 2007 WL 2255224, at *15; *Perez v. Duncan*, No. C 04-5014 SI (PR), 2005 WL 2290311, at

2   *11 (N.D. Cal. Sept. 20, 2005); *Darn*, 2003 WL 21148412, at *11-12.  The 1999 version, unlike the

3   prior version, contains the following language: "[I]f you find by a preponderance of the evidence

4   that the defendant committed a prior sexual offense, that is not sufficient by itself to prove beyond a

5   reasonable doubt that he committed the charged crimes in this case.  The weight and significance of

6   the evidence, if any, are for you to decide."  Because of this unequivocal language, judges in this

7   District have distinguished the 1999 version from the unconstitutional prior version which allowed

8   for "two routes of conviction, one by a constitutionally sufficient standard [*i.e.*, beyond a reasonable

9   doubt] and one by a constitutionally deficient one [*i.e.*, preponderance of the evidence]."  *Gibson*,

10  387 F.3d at 832.  *See, e.g.*, *Cata*, 2007 WL 2255224, at *15; *Perez*, 2005 WL 2290311, at *11;

11  *Darn*, 2003 WL 21148412, at *11-12.  Similarly, in unpublished opinions, the Ninth Circuit has

12  indicated that, when the above language is provided, a habeas petitioner is not entitled to relief.  *See*

13  *Hassinger v. Adams*, 243 Fed. Appx. 286, 287 (9th Cir. 2007); *McGee v. Knowles*, 218 Fed. Appx.

14  584 (9th Cir. 2007); *see also* Fed. R. App. Proc. 32.1 (providing that a court may not prohibit or

15  restrict the citation of an unpublished opinion issued on or after January 1, 2007).

16          In light of the above case law, the state appellate court's decision that there was no

17  constitutional violation as a result of the CALJIC instruction must be considered objectively

18  reasonable.

19  D.      Denial of Continuance

20          Sullivan contends next that a writ of habeas corpus should issue because his Fifth and Sixth

21  Amendment rights were violated when the trial court denied his request for a continuance so that he

22  could obtain the appearance of three witnesses: Ms. Vogtman, Serena's mother who already had

23  testified; Joy Teharo, Serena's cousin; and Edie Peyghambary, an impeachment witness.  The record

24  reflects that Sullivan did not specify in his request to the trial court how long a continuance was

25  being sought.

26          As a general matter, the decision to grant or deny a requested continuance lies within the

27  broad discretion of the trial court, and will not be disturbed absent clear abuse of that discretion.  *See*

28  *United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir. 1985).  The following factors are considered

**United States District Court**
For the Northern District of California

1    when considering whether an abuse of discretion has occurred: (1) whether the criminal defendant

2    was diligent, (2) whether the continuance would have served a useful purpose, (3) whether the

3    continuance would have inconvenienced the trial court or the government, and (4) the degree of

4    prejudice suffered by the criminal defendant as a result of the denial.  *See id.* at 1359-61.

5         Notably, "[n]one of the first three factors is ordinarily dispositive."  *United States v. Rivera-*

6    *Guerrero*, 426 F.3d 1130, 1139 (9th Cir. 2005).  For example, the Ninth Circuit has "reversed a

7    district court's denial of a continuance even after concluding that the [criminal] defendant failed the

8    diligence prong of the analysis."  *Id.* at 1140.  However, for a denial of a continuance to be an abuse

9    of discretion, the criminal defendant must establish prejudice.  *See id.* at 1139.

10        If the denial of a continuance is at issue in a habeas proceeding, the habeas petitioner must

11   show *actual* prejudice to his defense resulting from the trial court's refusal to grant the continuance.

12   *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).  Other courts have imposed a similar

13   requirement, holding that, for denial of a continuance to form the basis of a habeas petition there

14   must be not only an abuse of discretion, but any resulting error must be "so arbitrary and

15   fundamentally unfair that it violates constitutional principles of due process."  *Bennett v. Scroggy*,

16   793 F.2d 772, 774-75 (6th Cir. 1986) (citation omitted); *see also United States v. Searcy*, 768 F.2d

17   906, 912-913 (7th Cir. 1985) (indicating that a denial of a continuance would be a constitutional

18   violation only where it rendered a trial fundamentally unfair).

19        As discussed above, *see* Part I, *supra*, Sullivan wished to have Ms. Vogtman, Joy, and Ms.

20   Peyghambary testify about whether or not Ms. Vogtman tried to suborn perjury from Joy.

21   Allegedly, Joy told Ms. Peyghambary that Ms. Vogtman had asked Joy to say that she was aware of

22   the fact that Sullivan had been touching Serena but Joy was not willing to make that statement.

23   Sullivan also wanted to have Joy testify because Joy allegedly told Ms. Peyghambary upon repeated

24   questioning that Sullivan had never touched her.

25        The state court of appeal denied Sullivan the relief he requested.  According to the court, the

26   denial of a continuance was not improper because Sullivan had failed to exercise due diligence:

27   Sullivan failed to question Ms. Vogtman about Joy's allegations when she was on the witness stand

28

United States District Court

For the Northern District of California

1    and also failed to timely subpoena Joy for trial.  *See* Ex. G (Order at 20-21).  As for Ms.

2    Peyghambary, the admissibility of her testimony depended on Joy's testimony.

3           The state court of appeal further held that the denial of the continuance was not prejudicial

4    because any testimony about whether or not Ms. Vogtman attempted to suborn perjury from Joy was

5    not prejudicial because it was

6                  to some extent cumulative.  There was a stipulation that during
                   [Serena's] SART examination, a nurse witnessed the mother

7                  prompting the child and became concerned about this.  In addition, the
                   jury had heard testimony that [Ms. Vogtman] was angry with

8                  defendant for many reasons and had reported him to the police on
                   several occasions for supposed misconduct with [Serena] and [Ciera].

9                  It was clear that [Ms. Vogtman] blamed [Sullivan] for her
                   circumstances and that she wanted her children to live with her.

10                 [Serena] also testified that she wanted to live with her mother, which
                   testimony was corroborated by other witnesses.  Further, [Serena]

11                 testified that she told [her mother] about [Sullivan's] acts after she
                   learned that [he] touched [Elizabeth] inappropriately.  Accordingly,

12                 the question whether [Ms. Vogtman] prompted [Serena] to make false
                   accusations was not removed from the jury's consideration.

13

14   *Id.* (Order at 21).

15          The state appellate court's conclusion that there was no constitutional violation as a result of

16   the denied continuance was not objectively unreasonable.  First, the record supports the court's

17   finding that defense counsel failed to exercise due diligence, both with respect to Ms. Vogtman and

18   Joy.  With respect to Ms. Vogtman, defense counsel could have, but did not, question Ms. Vogtman

19   about the alleged subornation of perjury while she was on the witness stand testifying for the

20   prosecution's case-in-chief.  Plausibly, defense counsel had a strategic reason for not questioning

21   Ms. Vogtman about this issue when she was testifying as part of the prosecution's case-in-chief, but,

22   upon taking that strategy, defense counsel then should have taken steps to ensure that Ms. Vogtman

23   would be available for recall as part of the defense's case-in-chief.  Defense counsel, *e.g.*, could

24   have, but did not, alert the trial court that he would likely recall Ms. Vogtman as part of the defense

25   case.  Defense counsel could have asked the Court to order Ms. Vogtman to remain available for the

26   balance of trial.  *Cf.* Cal. Code Civ. Proc. § 1991 ("Disobedience to a subpoena, or a refusal to be

27   sworn, or to answer as a witness, or to subscribe an affidavit or deposition when required, may be

28   punished as a contempt by the court issuing the subpoena.").

**United States District Court**
For the Northern District of California

In his petition, Sullivan suggests that it was not his or his counsel's burden to ensure that Ms. Vogtman was available for recall; rather, he contends that the burden was on the prosecution, as the party who issued the subpoena for Ms. Vogtman's presence at trial, and on the trial court, as the enforcer of subpoenas, *see* Cal. Code Civ. Proc. § 1991, to ensure Ms. Vogtman's presence. Sullivan, however, cites no authority to support this contention. Moreover, it does not make any sense to put the burden on either the prosecution or the trial court. Even though the prosecution was the party that issued the subpoena for Ms. Vogtman's presence at trial, *see* Ex. C (Pet.'s Br. at 49 (stating that Ms. Vogtman "testified during the prosecution case under prosecution subpoena"), it did so to ensure that Ms. Vogtman would be available as part of its own case-in-chief. There is no reason why the prosecution should bear the burden of ensuring that Ms. Vogtman would also be available for the defense case. If Ms. Vogtman was critical to the defense case, then Sullivan should have subpoenaed her himself. As for the trial court, because Sullivan did not alert the court that he was in fact likely to recall Ms. Vogtman, the court had no reason to order Ms. Vogtman to continue to appear for trial or risk being sanctioned.

As for Joy, the record indicates that defense counsel had sufficient notice to arrange for her testimony. As the prosecution noted at trial, the issue regarding Joy's statements appeared in a document dated October 26, 2000, *see* Ex. B (RT 547) -- a fact that Sullivan does not dispute -- and yet Joy still was not served with a subpoena until the last day of trial. Although defense counsel claimed that service was delayed because he had a "bad address" and there was "no one . . . around to accept the subpoenas" at the kinship center that was taking care of Joy, *id.* (RT 544), he provided no justification as to why he had never before even tried to speak to Joy regarding her statements.[6] *See id.* (RT 546) (defense counsel admitting that "I've not talked to Joy").

Any lack of diligence by defense counsel -- either with respect to Ms. Vogtman or Joy -- however, is not dispositive. As discussed above, the main question for the Court is whether Sullivan

---

[6] The record also suggests that the denial of a continuance was not necessarily improper since it was not even clear that Joy would be available and willing to testify. As noted above, when defense counsel talked to the social worker about the subpoena for Joy's testimony, the social worker said that she would be getting an attorney involved. *See id.* (RT 544-45). The social worker also told defense counsel that she would only be able to tell him about the *possibility* of talking to Joy that afternoon. *See id.* (RT 546).

24

United States District Court

For the Northern District of California

1   suffered *actual* prejudice as a result of the denied continuance, which informs whether the denial

2   rendered his trial fundamentally unfair.  Sullivan has failed to establish such.  While it is likely that

3   Sullivan's defense would have "been strengthened by the additional evidence had the trial court

4   granted him the continuance[] to secure the additional witnesses, the denial[] of the continuance[]

5   did not prevent him from putting on his defense or from attacking the strength of the state's case."

6   *Searcy*, 768 F.2d at 913.  As the state appellate court noted, any testimony about whether Ms.

7   Vogtman tried to get Joy to lie was ultimately not "unique and non-cumulative."  *Bennett*, 793 F.2d

8   at 775.  That is, even without the three witnesses' testimony, the record contains evidence that raised

9   the possibility that Serena's charges were false or were prompted by her mother, Ms. Vogtman.

10   　　　　For example, Serena testified that she did not tell her mother about Sullivan's sexual

11   touching until after her mother had told her that Sullivan had similarly touched Elizabeth.  *See* Ex. B

12   (RT 59-61, 74, 98).  Serena also admitted several times that she had expressed a desire to live with

13   and take care of her mother.  *See id.* (RT at 54-55, 67, 76, 101-02).  In addition, Ms. Vogtman

14   testified that after the divorce from Sullivan, she was motivated to get her children back and to have

15   Serena  live with her.  *See id.* (RT at 219-20).  She also testified that she was bitter after her divorce

16   from Sullivan.  *See id.* (RT at 222).  Finally, testimony from a nurse suggested an observation of

17   prompting by Serena's mother during Serena's SART examination, *see id.* (RT at 466-67), and a

18   stipulation was read to the jury which explicitly stated that the nurse had in fact witnessed Ms.

19   Vogtman prompting Serena and became concerned enough about this fact that she informed a police

20   officer about it.  *See id.* (RT 527).  Thus, as the state court of appeal in this case properly found, the

21   question of whether Serena was prompted by her mother to make the allegations against Sullivan

22   was still available for jury consideration.  *Compare Rivera-Guerrero*, 426 F.3d at 1142 (finding

23   prejudice where the result of the denied continuance was to deprive the criminal defendant of the

24   *only* testimony potentially effective to his defense); *United States v. Pope*, 841 F.2d 954, 957 (9th

25   Cir. 1988) (concluding that there was prejudice because of the inability, without the continuance, to

26   obtain the *only* testimony potentially supportive of an insanity defense).

27

28

**United States District Court**
For the Northern District of California

1   In sum, the state appellate court's conclusion that there was no constitutional violation as a

2   result of the denied continuance -- particularly in the absence of any actual prejudice to Sullivan --

3   was not objectively unreasonable.

4   E.      Ineffective Assistance of Trial Counsel

5           Sullivan contends that he is also entitled to habeas relief because his trial counsel rendered

6   ineffective assistance of counsel when he (1) failed to obtain adequate notice of the incidents against

7   which he needed to defend and (2) failed to produce Ms. Vogtman, Joy, and Ms. Peyghambary as

8   defense witnesses in a timely manner.

9           The Supreme Court has recognized a claim of ineffective assistance of counsel as a denial of

10   the Sixth Amendment right to counsel.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

11   The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

12   undermined the proper functioning of the adversarial process that the trial cannot be relied upon as

13   having produced a just result.  *See id.*  In order to prevail on an ineffectiveness of counsel claim, the

14   petitioner must establish that (1) counsel's performance fell below an "objective standard of

15   reasonableness" under prevailing professional norms and (2) counsel's deficient performance

16   resulted in prejudice where "there is reasonable probability that, but for counsel's unprofessional

17   errors, the result of the proceeding would have been different."  *Id.* at 687-88, 694.  Failure to make

18   the required showing of either deficient performance or sufficient prejudice defeats the

19   ineffectiveness claim.  *See id.* at 700.  Both the Supreme Court and the Ninth Circuit have adopted

20   the *Strickland* framework as "clearly established Federal law" for the purposes of federal habeas

21   analysis.  *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000); *Gonzalez v. Knowles*, 515 F.3d

22   1006, 1014 (9th Cir. 2008).

23           1.      Trial Counsel's Failure to Move for Greater Specificity

24           According to Sullivan, "the complaint, the preliminary examination testimony, and the

25   information all failed to identify the specific incidents which gave rise to the seven charged counts,"

26   but, in spite of such, trial counsel failed to take any action "to obtain adequate notice as to which

27   counts were supposedly established by which alleged factual incidents," Ex. C (Pet.'s Br. at 65-66),

28   and therefore rendered ineffective assistance.  Sullivan contends that effective counsel would have

filed, *e.g.*, a motion pursuant to California Penal Code § 995 or a demurrer pursuant to § 1002 to determine what specific incidents were at issue with respect to the seven charged counts.  Had trial counsel "moved to require that the incidents in each charged count be specified as to date, time, and place, the prosecutor would have been unable so to specify" and "[t]his would have resulted in the prosecutor having to dismiss all the counts of § 269, or recharging this case under Penal Code § 288.5, continuous sexual abuse of child, which requires proof of three sexual incidents, but without any need to specify time, date, or place."  Ex. C (Pet.'s Br. at 67).  Sullivan claims that "when all is said and done, this was really a § 288.5 continuous sexual abuse case."  *Id.*

The state court of appeal rejected Sullivan's claim of ineffective assistance, concluding that Sullivan had failed to show both deficient performance and prejudice.  The state appellate court's conclusion was not objectively unreasonable.  First, as the court pointed out, there was no deficient performance by trial counsel, nor could there by any prejudice, in light of *People v. Jones*, 51 Cal. 3d 294 (1990).  There, the California Supreme Court noted that, in child molestation cases where there is a "resident child molester," the victim often "testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults."  *Id.* at 299.  Even so, "the prosecution of child molestation charges based on [such] generic testimony does not, of itself, result in a denial of a [criminal] defendant's due process right to fair notice of the charges against him" because of the availability of the preliminary hearing, as well as demurrer and pretrial discovery procedures.  *Id.* at 318.  The court emphasized in particular that the transcript of the preliminary hearing, not the accusatory pleading, affords a criminal defendant practice notice of the acts against which he must defend.  *See id.*  The court also indicated that so long as the victim can describe with sufficient specificity (1) the kind of act or acts allegedly committed (*e.g.*, intercourse, oral copulation, sodomy), (2) the number of acts allegedly committed (*e.g.*, twice a month), and (3) the general time period in which the acts allegedly occurred (*e.g.*, the summer before the fourth grade), then there is sufficient evidence to convict.  *See id.* at 316.

In the instant case, trial counsel was not deficient since the transcript of the preliminary hearing establishes that evidence was presented as to (1) the kind of act or acts allegedly committed,

United States District Court

For the Northern District of California

1  (2) the number of acts allegedly committed, and (3) the general time period in which the acts

2  allegedly occurred.  During the preliminary hearing, Serena testified that the molestations began

3  when she was in the second grade and continued through third grade, *see* Ex. A (CT at 16, 39); that

4  Sullivan had touched her vagina, between her legs and in her bottom, *see id.* (CT at 17-18); that

5  Sullivan had put his penis inside her vagina and bottom, *see id.* (CT at 19, 26,38); that Sullivan had

6  touched her vagina with his tongue, *see id.* (CT at 27); that Sullivan had put his penis in her mouth,

7  *see id.* (CT at 34-35); and that Sullivan molested her "[a] lot" and "on different days."  *Id.* (CT at

8  20).

9       Sullivan contends still that the evidence presented at the preliminary hearing did not give

10 him adequate notice of the charges against him.  In support of this contention he relies largely on the

11 comment of the magistrate judge, who stated at the conclusion of the preliminary hearing: "I think

12 you are going to need a little more specificity, but for the purposes of the prelim, there is enough

13 evidence to believe to hold him to answer."  Ex. A (CT at 85).  This statement by the magistrate

14 judge is not dispositive.  Regardless of what the magistrate judge said, there was no need for

15 additional specificity (and therefore no ineffective assistance) based on *Jones*.  Moreover,

16 ultimately, the magistrate judge held that there was sufficient evidence to support the charges against

17 Sullivan.  Indeed, at the preliminary hearing, the magistrate judge explicitly listed the acts (anal sex,

18 vaginal sex, oral copulation, digital penetration, and Sullivan placing his penis between Serena's

19 legs) which formed the basis for Sullivan's charges and concluded that there was sufficient evidence

20 to support a finding that those acts occurred when Serena was in the second and third grades.  *See id.*

21 (CT at 84-85).

22      Second, as the state appellate court concluded, even if trial counsel was deficient, Sullivan

23 has failed to establish prejudice -- *i.e.*, that, but for counsel's unprofessional error, the result of the

24 proceeding would have been different.  Even if, as Sullivan argues, there was conflicting evidence as

25 to one specific incident (*i.e.*, the time that Sullivan last sexually assaulted Serena), there was still

26 substantial evidence establishing that multiple other sexual assaults had taken place.  Serena testified

27 at trial that the touchings by Sullivan happened about once or twice a week during the second and

28 third grade.  *See* Ex. B (RT 19, 34, 36).

United States District Court

For the Northern District of California

Sullivan's contention that he must have been prejudiced because of a jury note expressing confusion about the conduct with which he was charged is not availing. The jury note at issue read as follows: "Counts 2 and 6 are Identical. Counts 3 and 4 are Identical. Why are they Repeated?" Ex. A (CT 281). Contrary to what Sullivan argues, this note from the jury does not necessarily demonstrate that there was a lack of specificity in the evidence at trial about the assaults allegedly committed by Sullivan. Moreover, as the state court of appeal pointed out, any confusion that the jury had was addressed by the trial court,[7] and the jury was apparently content with the response, as it did not make any further inquiry into the matter.

---

[7] The trial court responded:

> The Information charges in Counts 2 and 6 aggravated sexual assault upon a child under the age of 14 and ten or more years older than the defendant in violation of Penal Code Section 269.
>
> In this case after talking with the attorneys, it's my understanding that those charges accuse the defendant of digital penetration . . . .
>
> . . . .
>
> And then Counts 3 and 4 are also identical which are violations charged, violations of Section 269, aggravated assault of a child under the age of 14 and ten year or more years younger than the defendant, committing a violation of Section 288(A) which is oral copulation. All four counts, I guess all counts being basically between the same time period.
>
> As I understand it from talking to the attorneys that because the alleged acts took place over a period of between two and a half, three years, there were allegations that there was more than one act. Let's say of digital penetration, there was alleged more than one act of oral copulation.
>
> So the counts are identical, the language is identical, the dates are identical. It's up to the jury to decide whether or not there is evidence for a finding of guilt beyond a reasonable doubt as to one or more acts let's says of digital penetration or one or more act of oral copulation.
>
> . . . .
>
> . . . As an example, say somebody is charged with 100 counts of auto theft and he stole one-hundred 1969 black Mustangs with 29 identical, okay, but they all happened to be different cars. The D.A. could charge anywhere from 1 to 100 counts of auto theft.

Ex. B (RT 9-10).

United States District Court

For the Northern District of California

2.    Trial Counsel's Failure to Produce Defense Witnesses

Sullivan further argues that trial counsel was deficient because of his failure to timely produce as defense witnesses Ms. Vogtman, Joy Teharo, and Ms. Peyghambary.  The Court agrees that trial counsel did render ineffective assistance because he did not act diligently in trying to secure their appearance for the defense case-in-chief.  However, as noted above, Sullivan must still establish prejudice as a result of the deficient performance -- *i.e.*, that, but for counsel's unprofessional error, the result of the proceeding would have been different.

The state appellate court held that there was no Sixth Amendment violation because the failure to produce the three witnesses had no prejudicial effect.  This conclusion was not objectively unreasonable -- *i.e.*, if the denial of the continuance did not prejudice Sullivan's case, then likewise there was no prejudice here based on the failure to produce the three witnesses.  *See* Part II.D, *supra*. Accordingly, the Court concludes that Sullivan has not met his burden of proving ineffective assistance of counsel on this ground.

F.    Trial Court's Failure to Conduct Inquiry into Sullivan's Dissatisfaction with Sentencing
       Counsel

In his habeas petition, Sullivan also argues that the trial court, by failing to conduct any inquiry at the resentencing hearing into his dissatisfaction with his sentencing counsel, Mullin, violated (1) his Sixth Amendment right to competent counsel and (2) his automatic right to discharge retained counsel.  *See* Ex. L (Pet.'s Br. at 27).  The state appellate court rejected Sullivan's argument on the basis that he had failed to give notice to the trial court that he did not want Mullin to represent him.

The state court's decision was neither contrary to nor did it involve an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  A criminal defendant undoubtedly has, under the Sixth Amendment, the right to retain his or her counsel of choice.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) ("The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'  We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent

30

1  him.").  But even if the Court were to assume that the automatic right to discharge a retained

2  attorney flows from the right to hire counsel of choice and implies the right to effective assistance of

3  counsel, *see People v. Ortiz*, 51 Cal. 3d 975, 983, 985 (1990) (concluding such), it is not clearly

4  established federal law as determined by the Supreme Court that the Sixth Amendment or any other

5  provision of the federal Constitution requires a trial court to inquire into the basis for a defendant's

6  dissatisfaction with counsel or request to secure new counsel.  The Ninth Circuit has simply stated

7  that "our case law *favors* an inquiry when a party seeks substitute counsel."  *United States v. Smith*,

8  282 F.3d 758, 764 (9th Cir. 2002) (emphasis added).  While the Sixth Circuit has indicated that a

9  trial court is required to conduct an inquiry, it has also held that that requirement is not clearly

10  established Supreme Court precedent.  *See James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006)

11  (acknowledging an earlier Sixth Circuit case which held that a "trial court has a duty to determine

12  the reasons for an indigent defendant's dissatisfaction with current counsel when that indigent

13  defendant requests that appointed counsel be discharged and new counsel appointed" but stating that

14  the prior case "is not 'clearly established Federal law, as determined by the Supreme Court of the

15  United States'").  Sullivan has cited no Supreme Court precedent on this point.

16          Even if a trial court's duty to conduct an inquiry was clearly established federal law as

17  determined by the Supreme Court, "[t]he need for an inquiry [by a trial court] will not be recognized

18  . . . where the defendant has not evidenced his dissatisfaction or wish to remove his . . . counsel."

19  *United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) (concluding that the trial court was not put

20  on adequate notice by the defendant because, at no point did he "try to 'fire' his counsel, ask for new

21  counsel, or suggest that he wished to conduct his own defense").  *Compare Rodriguez Benitez v.*

22  *United States*, 521 F.3d 625, 632-36 (6th Cir. 2008) (concluding that, although the defendant did not

23  explicitly request a new attorney, his statements were sufficient to trigger the trial court's obligation

24  to inquire into his dissatisfaction with his counsel; the defendant -- as well as his counsel -- had told

25  the trial court that counsel had been fired and that the defendant did not want counsel to represent

26  him).

27          In the instant case, there is no dispute that, when Sullivan personally appeared before the

28  trial court on resentencing, *see* Ex. K (RT at 3), he did not ask the trial court for any relief -- *e.g.*, for

United States District Court
For the Northern District of California

1  a substitution of counsel or for the right to proceed pro se.  Nor did he give any indication that he

2  protested or objected to sentencing counsel's presence at the hearing.  Sullivan contends that, in

3  spite of such, the trial court was on notice of his dissatisfaction with sentencing counsel because,

4  during the appeals process (which eventually led to his resentencing), he served on the trial court

5  copies of his appellate briefs, and, in the appellate briefs, he made a claim of ineffective assistance

6  by sentencing counsel.  The problem for Sullivan is that, even though the appellate briefs were

7  served on the trial court, the briefs were asking for relief from the state appellate court, not the trial

8  court.

9        Accordingly, it was not unreasonable for the state appellate court to conclude that the trial

10  court's duty to inquire was not triggered unless and until Sullivan presented the issue of his

11  dissatisfaction with sentencing counsel directly to the trial court -- *i.e.*, sought relief from the trial

12  court directly.  *See* Ex. O (Order at 5) (acknowledging that Sullivan's appellate briefs -- in which he

13  made a claim of ineffective assistance by sentencing counsel -- were served on the trial court, and

14  not just the appellate court, but stating that "[w]hat is printed in the brief is directed to the appellate

15  court for relief").  Sullivan has cited no authority to support his contention that a trial court has a

16  duty to inquire in the absence of a request to substitute counsel made to the trial court or a statement

17  of dissatisfaction with counsel made to the trial court.

18        The state appellate court also implied that the trial court had no duty to inquire because the

19  state appellate court's opinion did not require the trial court to do so on remand; nor did it otherwise

20  direct the trial court to address sentencing counsel's competence on remand.  *See* Ex. O (Order at 6)

21  (stating that, "[w]hen the matter was returned to the trial court, the court had no occasion to address

22  counsel's competence, an issue never presented to it").  As above, this conclusion was not

23  unreasonable, and therefore habeas relief is not warranted.  Contrary to what Sullivan argues, the

24  state appellate court's opinion remanding the case for resentencing did not make any finding, either

25  explicitly or implicitly, that sentencing counsel had in fact rendered ineffective assistance.  Indeed,

26  the state appellate court never expressed any opinion on whether counsel's performance was

27  deficient because, as it expressly recognized, it was not required to reach a conclusion on that issue

28  and instead could dispose of an ineffectiveness claim simply on the ground of lack of prejudice.  *See*

United States District Court

For the Northern District of California

Ex. O (Order at 30).  The state appellate court ultimately held that there was no prejudice as a result of sentencing counsel's conduct because it was remanding the case for resentencing.  *See id.* (Order at 31).

G.      Ineffective Assistance of Sentencing Counsel

Sullivan further contends that habeas relief is appropriate in his case because his sentencing counsel, Mullin, rendered ineffective assistance of counsel by (1) failing to withdraw as counsel for Sullivan or failing to notify the trial court, during resentencing, that Sullivan had questioned his effectiveness; (2) failing to be prepared at the resentencing hearing or failing to seek a continuance in order to become prepared; and (3) conceding that mandatory consecutive sentencing was appropriate.

The Court rejects Sullivan's argument at the outset because the Ninth Circuit has explicitly held that there is no clearly established United States Supreme Court precedent governing ineffective assistance of counsel claims in the noncapital sentencing context.  *See Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1244-45 (9th Cir. 2005).  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court

> expressly declined to consider the role of counsel in an ordinary sentencing, which . . . may require a different approach to the definition of constitutionally effective assistance.  Moreover, since *Strickland*, the Supreme Court has not delineated a standard which should apply to ineffective assistance of counsel claims in noncapital sentencing cases.

*Davis*, 443 F.3d at 1158.  Because there is no clearly established Supreme Court precedent that applies, there is no habeas relief available under AEDPA to Sullivan for this claim.  *See Davis*, 443 F.3d at 1158; *see also Hernandez v. LaMarque*, No. C 03-3738 MMC (PR), 2006 U.S. Dist. LEXIS 62636, at *12 (N.D. Cal. Aug. 18, 2006) (citing *Davis* and *Cooper-Smith* in support of the holding that "petitioner cannot obtain habeas relief on his claim of ineffective assistance of counsel at sentencing").

However, even if the Court were to apply the general *Strickland* standard for ineffective assistance of counsel to Sullivan's claim here, the claim would still fail for the reasons discussed below.

1

2          1.      Failure to Withdraw or Notify Trial Court

3          Under *Strickland*, Sullivan must first establish that counsel's performance was deficient, *i.e.*,

4    that it fell below an "objective standard of reasonableness" under prevailing professional norms, in

5    order to prevail on his ineffectiveness claim. *Strickland v. Washington*, 466 U.S. 668, 687-88

6    (1984). Judicial scrutiny of counsel's performance must be highly deferential, and a court must

7    indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

8    professional assistance. *See id.* at 689. Second, Sullivan must establish that he was prejudiced by

9    counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's

10   unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A

11   reasonable probability is a probability sufficient to undermine confidence in the outcome. *See id.*

12         According to Sullivan, just as the trial court should have been put on notice that he was not

13   satisfied with Mullin's representation, Mullin himself should have been put on notice of such; thus,

14   his failure to withdraw as counsel or (at the very least) alert the trial court to Sullivan's lack of

15   satisfaction constituted ineffective assistance of counsel. *See* Ex. L (Pet.'s Br. at 27-28). Sullivan

16   argues that Mullin was on notice based on (1) the state appellate court opinion (filed on April 2,

17   2003) in which the court "effectively determined . . . that Mullin[] was negligent for his failure in

18   2001 to challenge the consecutive sentencing," Ex. L (Pet.'s Br. at 27), and (2) the appellate briefs

19   that Sullivan had filed with the state appellate court, which were concurrently served on the trial

20   court.

21         The state appellate court rejected Sullivan's argument, stating that, like the trial court,

22   "Mullin had no notice that [Sullivan] was dissatisfied with his representation when he appeared with

23   [Sullivan] for resentencing" and therefore "had no duty to raise the issue to the trial court." Ex. O

24   (Order at 6). In so concluding, the court essentially found that Sullivan had failed to show deficient

25   performance on the part of sentencing counsel (*i.e.*, the first *Strickland* prong).

26         The state appellate court's conclusion that Mullin had no notice of Sullivan's dissatisfaction

27   at the time of resentencing is not consistent with the record. It was clear from the court's opinion

28   (filed on April 2, 2003) that Sullivan had raised an ineffectiveness claim against Mullin based on his

United States District Court

For the Northern District of California

1   failure to challenge the choice of consecutive sentences.  *See* Ex. G (Order at 31).  Thus, at the time

2   of resentencing, Mullin should have been on notice that Sullivan had problems with his

3   representation.

4         But this Court's disagreement with the state appellate court on this fact does not require

5   issuance of habeas relief.  "[I]t is the state court's decision, not its reasoning, that is judged under the

6   'unreasonable application' standard."  *Williams v. Warden*, 422 F.3d 1006, 1010 (9th Cir. 2005); *see*

7   *also Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 3003) (stating that "the intricacies of the

8   state court's analysis need not concern us"; focusing instead on the state court's decision); *Cruz v.*

9   *Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (noting that in habeas proceedings, "we are determining the

10   reasonableness of the state courts' 'decision,' not grading their papers") (citation omitted); *Neal v.*

11   *Puckett*, 239 F.3d 683, 696 (5th Cir. 2001) (stating that "[i]t seems clear to us that a federal habeas

12   court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written

13   opinion explaining that decision").  The state appellate court's rejection of the ineffective assistance

14   claim was not unreasonable because, although Mullin was on notice of Sullivan's dissatisfaction, it

15   was not unreasonable for Mullin not to alert the trial court to that fact since, at the resentencing

16   hearing, that dissatisfaction was evidently not so substantial as to warrant action: Sullivan did not

17   object to Mullin's appearance, try to fire Mullin, or ask Mullin to withdraw.  *See Babbitt v.*

18   *Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (noting that the relevant inquiry is not what defense

19   counsel could have done, but rather whether the choices made by defense counsel were reasonable).

20   Sullivan has not provided any case law establishing that, under those circumstances, Mullin had a

21   duty to withdraw or bring the issue to the attention of the trial court.  Hence, there is no clearly

22   established federal law making Mullin's conduct ineffective assistance.

23         Furthermore, even if Mullin's failure to notify the trial court constituted deficient

24   performance, Sullivan must still show prejudice as a result -- *i.e.*, that "there is a reasonable

25   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

26   been different."  *Strickland*, 466 U.S. at 694.  Even if Mullin did alert the trial court to Sullivan's

27   dissatisfaction, and even if the trial court allowed new counsel to appear to represent Sullivan (or

28   permitted Sullivan to represent himself), there is no reasonable probability that the result of the

United States District Court

For the Northern District of California

1  resentencing would have been any different.  As discussed below, there was substantial evidence

2  presented at trial to establish that the crimes occurred on separate occasions, thus justifying

3  consecutive sentencing pursuant to California Penal Code § 667.6(d).  *See* Part II.G.2, *infra*.

4          2.      Failure to be Prepared and/or to Seek Continuance

5          Sullivan argues next that Mullin rendered ineffective assistance because he was not prepared

6  at the resentencing hearing as he had failed to read the trial transcripts and/or appellate briefs prior

7  to the resentencing.[8]  As proof that Mullin failed to read the transcripts and briefs, Sullivan points to

8  an exchange between Mullin and the trial court where Mullin

> attempted to argue that the facts of the case did not establish that
> [Sullivan] had a chance to reflect between occasions, within the
> meaning of Penal Code § 667.6(d)[.]  [T]he trial judge stated: "Well,
> Mullin, you weren't at the trial . . . ."  If Mullin[] had read the
> transcript, or the appellate briefs, then he would have replied along the
> lines of "Well, your Honor, I read the transcript (or the appellate
> briefs), and the facts there show me that . . . ."  Mullin['s] failure to
> respond in that way shows that he had not read the transcript."

14  Ex. L (Pet.'s Br. at 43) (quoting from transcript for resentencing hearing).

15          The state appellate court was not persuaded that the above established lack of preparation on

16  the part of Mullin.  The court explained: "From Mullin's statement that [Sullivan's] pattern of

17  behavior over the two years he was molesting his daughter never deviated from a repetitive '[l]ock-

18  step action without any new awareness or insights at all,' it appears that he was acquainted with the

19  facts established at trial."  Ex. O (Order at 7) (quoting Ex. K (RT 8)).  The court added that, "even if

20  Mullin had been vague on the facts, there was no prejudice [because] [i]t is not reasonably likely

21  that the sentence would have been reduced if counsel had argued that there was no evidence the

22  crimes occurred on separate occasions."  *Id.*  "[Serena] testified that [the] assaults occurred once or

23  twice a week for over two years."  *Id.* (Order at 11).  Furthermore, she testified that

> multiple sex acts were performed on her each time, [and] where a
> defendant commits multiple sex acts in one session, each separate act

---

[8] It is clear from the record that, prior to the resentencing, Mullin had read the state appellate court's opinion which ordered the remand for resentencing.  *See* Ex. K (RT 3) (Mullin stating that "my reading of the opinion is that although consecutive sentencing is mandatory the -- this Court should have made an expressed and explicit findings on the record of specific items in the evidence that support that mandatory consecutive").

United States District Court

For the Northern District of California

1
2
3

> can constitute a separate occasion for purposes of section 667.6, subdivision (d), when the evidence shows, for example, that the defendant ceased his activity to change his position, give orders, disrobe, or otherwise interrupt his activities, thus allowing time for reflection and the decision to resume his sexual assault.

4  *Id.* (citing *People v. Garza*, 107 Cal. App. 4th 1081, 1092 (2003)).

5        The state appellate court's decision was neither contrary to, nor did it involve an

6  unreasonable application of, clearly established federal law as determined by the United States

7  Supreme Court.  Sullivan's argument is that Mullin's performance at the resentencing hearing was

8  deficient because he did not read the trial transcripts and/or the appellate briefs.  But the record does

9  not establish that the state appellate court made an unreasonable determination of fact.  There is

10  insufficient evidence to support the claim that Mullin failed to read the transcripts and briefs.

11  Simply because Mullin did not affirmatively say that he reviewed the transcripts or briefs in

12  response to the trial court's comment, "Well, Mullin, you weren't at the trial," is not enough.[9]  As

13  the state appellate court noted, Mullin's statements at trial indicated that he was familiar with what

14  had taken place at trial and on appeal.  During the resentencing hearing, Mullin stated:

15
16
17
18
19
20
21

> What is lacking in your finding [of separate occasions to justify consecutive sentencing pursuant to California Penal Code § 667.6(d)] is a -- is a -- is a pointer to the evidence that he had an opportunity to reflect.  That he -- apparently the man's state of mind was -- one's state of mind in a continuous course of conduct, as I understand the evidence, he -- he engaged in the continuous course of conduct that it was -- that had a signature to it.  It was characterized behaved by behavioral patterns that were distinctive and reflected in the record on appeal.  And I think that it is -- the evidence seems to point to the conclusion that he was locked into a behavioral pattern that didn't change.  He didn't seem to know how to change.  He didn't seem to have any awareness.

Ex. K (RT 7-8).

22
23
24

        Furthermore, even if Mullin had not been adequately prepared to proceed at resentencing

(and failed to seek a continuance in order to become prepared), Sullivan -- as the state appellate

25
26
27
28

---

        [9] In his state appellate court brief (which Sullivan cites in support of his habeas petition), Sullivan claimed that there was additional evidence that showed that Mullin did not read the trial transcripts or appellate briefs -- namely, the fact that Mullin did not obtain copies of the transcripts and briefs from Sullivan's appellate counsel.  *See* Ex. L (Pet.'s Br. at 43 n.33).  But no such evidence (such as a declaration from appellate counsel) is part of the record before this Court.  Furthermore, appellate counsel would not be the only source from which Mullin could obtain copies of the trial transcripts or appellate briefs.

United States District Court

For the Northern District of California

1  court concluded -- has failed to show that there is a reasonable probability that, had Mullin read the

2  entire transcript, the result of the proceeding would have been different.  Under California Penal

3  Code § 667.6(d), consecutive sentencing is mandatory if the crimes involve the same victim on

4  "separate occasions."  Cal. Pen. Code § 667.6(d).  A finding of separate occasions depends on

5  whether "the defendant had a reasonable opportunity to reflect upon his or her actions and

6  nevertheless resumed sexually assaultive behavior."  *Id.*  As the use of the term "resumed" reflects,

7  there must be a break of some kind in order for there to be a finding of separate occasions, but a

8  finding of separate occasions under § 667.6(d) does not require an obvious break in the perpetrator's

9  behavior or a break of any specific duration or a break in the perpetrator's control over the victim.

10 *See People v. Jones*, 25 Cal. 4th 98, 104 (2001) (referring to appellate court decisions holding

11 such).[10]  An "appreciable interval" of time between acts can be enough to establish separate

12 occasions.  *People v. Pena*, 7 Cal. App. 4th 1294, 1316 (1992) (concluding that there were not

13 separate occasions because "nothing in the record before this court indicates any appreciable interval

14 'between' the rape and oral copulation" -- "[a]fter the rape, appellant simply flipped the victim over

15 and orally copulated her" so that the assault was "continuous"; there was no resumption of sexually

16 assaultive behavior because the behavior did not cease).  Thus, for example, in *People v. Corona*,

17 206 Cal. App. 3d 13 (1988), the court concluded that there were two separate occasions where the

18 defendant raped the victim in a car, left the car for five minutes, and then raped her again.  *See id.* at

19 18 (but finding that there were no separate occasions occurring before the first rape because there

20 was no evidence of "any interval 'between' these sex crimes affording a reasonable opportunity for

21

22

_____

23 [10] *See, e.g., Garza*, 107 Cal. App. 4th at 1092 (upholding finding that rape was committed on a
separate occasion from forcible oral copulation because, in between assaults, the defendant ordered the

24 victim to strip, punched her in the eye, put his gun to her head and threatened to shoot her, and stripped
himself; also upholding finding that rape was committed on a separate occasion from digital penetration

25 of vagina because, in between assaults, the defendant played with the victim's chest, put his gun on the
back seat and pulled the victim's legs around his shoulders); *People v. Plaza*, 41 Cal. App. 4th 377, 384-

26 85 (1995) (upholding trial court's determination that there were five separate occasions because,
between each, the defendant had reasonable opportunity to reflect upon his actions where, after first

27 assault, the defendant took the victim to a different room and took off her clothes; after second assault,
the defendant listened to the victim's answering machine and punched three holes in the wall; after third

28 assault, the defendant slapped her face and verbally abused her for five minutes; and after fourth assault,
the defendant engaged in three telephone calls before assaulting her again).

United States District Court
For the Northern District of California

1   reflection; there was no cessation of sexually assaultive behavior hence defendant did not 'resume

2   sexually assaultive behavior'").

3        In the instant case, there was substantial evidence establishing that multiple sexual assaults

4   had taken place. Serena testified that Sullivan (1) put his mouth on her vagina more than five times,

5   (2) put his penis in her vagina more than five times, (3) put his penis in her mouth more than five

6   times, and (4) touched her vagina with his fingers more than five times. *See* Ex. B (RT 18-19, 23,

7   28-29, 32-33). She also testified that the touchings by Sullivan happened about once or twice a

8   week during the second and third grade. *See id.* (RT 19, 34, 36). These multiple sexual assaults

9   constituted separate occasions for purposes of § 667.6(d) because there was an appreciable interval

10  of time between incidents as indicated by Serena's testimony that she was molested on at least a

11  weekly basis for a two-year period. That Sullivan had the opportunity to reflect but chose to resume

12  the sexually assaultive behavior is established not only by the appreciable interval of time between

13  incidents but also by Serena's testimony that Sullivan would sometimes say that this is the last time

14  although it never was. *See id.* (RT 24).

15       Finally, as the state appellate court noted, multiple sex acts in one session can constitute

16  separate occasions. *See* Ex. O (Order at 11). Serena's testimony indicated that Sullivan did have

17  time to reflect between acts occurring in a single session since, when she would try to get away from

18  him, he would pull her back. *See* Ex. B (RT 24-25, 92).

19       3.   <u>Conceding Mandatory Consecutive Sentencing</u>

20       Sullivan asserts that his sentencing counsel, Mullin, also rendered ineffective assistance of

21  counsel because he partially conceded that mandatory consecutive sentencing under California Penal

22  Code § 667.6(d) was appropriate. *See* Ex. L (Pet.'s Br. at 23, 43). The state appellate court did not

23  address this specific argument but this Court's independent review of the record confirms that the

24  state appellate court's conclusion that there was no ineffective assistance by Mullin was not

25  objectively unreasonable. *See Richter v. Hickman*, 521 F.3d 1222, 1229 (9th Cir. 2008) ("When no

26  state court has explained its reasoning on a particular claim, we conduct 'an independent review of

27  the record to determine whether the state court's decision was objectively unreasonable.'").

28

39

**United States District Court**

For the Northern District of California

A concession by counsel does not automatically make assistance ineffective.  Courts have distinguished "between a statement which constitutes a tactical retreat, and one which amounts to a 'surrender of the sword.'"  *Messer v. Kemp*, 760 F.2d 1080, 1090 n.6 (11th Cir. 1985).  "[I]t is a 'complete concession of the defendant's guilt' which constitutes ineffective assistance of counsel." *Id.*  For example, a concession by defense counsel that there is no reasonable doubt that his client committed the crime is an abandonment of the defense of his client and will constitute ineffective assistance per se.  *See United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (holding such).

But there are situations where a counsel's concession is made because no better choice exists, in which case counsel's performance cannot be deemed deficient.  *See McDowell v. Calderon*, 107 F.3d 1351, 1358 (9th Cir. 1997) (noting that, where defense counsel chose to concede defendant's guilt of felony murder, where the evidence was overwhelming, but to contest whether defendant had the intent to kill -- which would have made him ineligible for a death sentence -- counsel was making "the best choice from a poor lot"); *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) (stating that "[t]he choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists").  As noted by the United States Supreme Court, pointing out a client's obvious shortcomings and making reasonable concessions "is precisely the sort of calculated risk that lies at the heart of an advocate's discretion."  *Yarborough v. Gentry*, 540 U.S. 1, 9 (2003).

Furthermore, many courts have held that a concession by counsel can be part of a sound strategy, particularly where there is strong evidence that supports the concession.  *See, e.g.*, *United States v. Fredman*, 390 F.3d 1153, 1154, 1158 (9th Cir. 2004) (stating that defense counsel's decision to admit in opening statement to some of the defendant's criminal wrongdoing was consistent with the reasonable and effective defense tactic of conceding weaknesses in defendant's case in an attempt to shift the jury's focus from the strong evidence against defendant to an issue more favorable to defendant, and was a reasonable tactic used by counsel "to avoid diminishing his credibility by arguing a lost cause"); *Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991) (noting that it can be a sound tactic for counsel to concede in closing argument "what the course of the trial

United States District Court

For the Northern District of California

1   has made undeniable -- that on a particular count the evidence of guilt is overwhelming . . . (and

2   there is no reason to suppose that any juror doubts this) and when the count in question is a lesser

3   count, so that there is an advantage to be gained by winning the confidence of the jury"; *Swanson*,

4   943 F.2d at 1075-76 (indicating that in some cases counsel may find it advantageous to concede

5   certain issues, *e.g.*, where evidence is overwhelming); *Willyam Jihad Munir v. White*, No.

6   C-96-1289-VRW, 1997 U.S. Dist. LEXIS 18164, at *6-7 (N.D. Cal. Nov. 13, 1997) (stating that

7   counsel's strategy to concede false imprisonment of the victim as part of the attempt to convince the

8   jury that the defendant's actions did not constitute robbery but rather the lesser-included offense of

9   grand theft was not objectively unreasonable, particularly as there was "clear evidence supporting

10  the false imprisonment charge").

11       In the instant case, the partial concession made by Mullin took place in the following

12  context.

13       Court:        The -- the Court heard all of the evidence in this matter.
                       The Court notes as follows:

14

15                     That the victim in this case was during the -- the time
                       alleged seven to nine years old. The actions occurred
16                     from the time she was in the second to the fourth grade,
                       and by her statements happened on many occasions.

17                     The Court believes that the age of the victim, along
                       with her testimony, and the fact that these actions
18                     clearly occurred over a significant two year period of
                       time, and the Court having heard the testimony in this
19                     case, and believing, in fact, that the defendant did have
                       the opportunity to reflect on his occasions resumed his
20                     sexually assaultive behavior, the Court believes that
                       this case comes squarely within the meaning of Penal
21                     Code 667.6(d).

22                     . . . .

23       Mullin:       Your Honor, would you note my objection in that I
                       think that 667.6 particular subdivision d calls for more.
24                     I think that you have found that the defendant had an
                       opportunity to reflect, but you haven't enlightened me
25                     or the defendant or the Court of Appeals as to what you
                       found in the evidentiary package that led you to that
26                     conclusion.

27       Court:        Well, Mullin, you weren't at the trial, neither was Mr.
                       Gibbons-Shapiro [the prosecutor at sentencing]. And --
28                     and the Court of Appeal had the full transcript and the

1                                   record in this matter.  And in the Court's opinion there
is no doubt whatsoever that these -- these sex crimes
2                                   occurred on separate occasions.  And the record will
support that statement.  And that is the ruling of the
3                                   Court.

4         Mullin:           *What I am referring to, sir, is that I concede that they*
5                                   *were on separate occasions.  I think the evidence is*
*abundant.  It's overwhelming that they were on*
6                                   *separate occasions.  What is lacking in your finding [of*
*separate occasions to justify consecutive sentencing*
7                                   *pursuant to California Penal Code § 667.6(d)] is a -- is*
*a -- is a pointer to the evidence that he had an*
8                                   *opportunity to reflect.*  That he -- apparently the man's
state of mind was -- one's state of mind in a continuous
9                                   course of conduct, as I understand the evidence, he --
he engaged in the continuous course of conduct that it
10                                 was -- that had a signature to it.  It was characterized
behaved [sic] by behavioral patterns that were
11                                 distinctive and reflected in the record on appeal.  And I
think that it is -- the evidence seems to point to the
12                                 conclusion that he was locked into a behavioral pattern
that didn't change.  He didn't seem to know how to
13                                 change.  He didn't seem to have any awareness.

14 Ex. K (RT 6-8) (emphasis added).  Mullin's partial concession was a reasonable one because -- as he

15 himself noted -- there was abundant evidence that the touchings occurred on at least a weekly basis

16 over the span of two years.  Mullin essentially made the only reasonable argument he could make.

17 There is no question that the acts were separate and not on continuous act.  Thus, Mullin latched

18 onto the only other factors allowed him under section 667.6 (d) — "the reasonable opportunity to

19 reflect" and resumption of his conduct.  And, these factors he argued as effectively as an attorney

20 could.  In light of this evidence, Mullin made the best choice that he had from a poor lot, arguing

21 that the trial court needed cite to specific evidence showing that Sullivan had the reasonable

22 opportunity to reflect upon his actions and asserting that the evidence suggested that Sullivan did not

23 have that opportunity and was instead taking "[l]ock-step action without any new awareness or

24 insights at all."  *Id.* (RT 8).

25         Accordingly, the state appellate court's refusal to find ineffective assistance was not

26 objectively unreasonable.

27 H.     *Apprendi*

28

Finally, Sullivan argues that mandatory consecutive sentencing may not be imposed under California Penal Code § 667.6(d) because the finding of separate occasions was not made by a jury and found beyond a reasonable doubt as required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny.

The state appellate court rejected the argument, citing *People v. Groves*, 107 Cal. App. 4th 1227 (2003):

> "A criminal defendant has a federal constitutional due process right to have every fact necessary to *conviction* proven by proof beyond a reasonable doubt. However, the United States Supreme Court has held that in a *sentencing* context, the state may link the severity of punishment to the presence or absence of a factor that the prosecution need not prove by proof beyond a reasonable doubt. If the specific fact at issue is not an element of the crime but is a factor that comes into play only after the defendant had been found guilty of the charges beyond a reasonable doubt and no increase in sentence beyond the statutory maximum for the offense established by the jury is implicated, then the state may consider this factor based on a lesser standard of proof."

Ex. O (Order at 13). The state appellate court indicated that there was no increase in Sullivan's sentence beyond the statutory maximum because the statutory maximum was mandatory consecutive sentences. *See id.* (Order at 14). Furthermore, this court is mindful that the jury did find defendant guilty beyond a reasonable doubt on each of the separate counts on which Sullivan was convicted.

The Court need not address the merits of the state appellate court's reasoning because habeas relief is not available to Sullivan for a simpler reason — that is, it is not clearly established federal law, as determined by the United States Supreme Court, that the *Apprendi* rule applies to consecutive sentences. Multiple courts, including this one, have reached this conclusion.[11]   *See Tabarez v. Clark*, No. 1:07cv1001 OWW DLB HC, 2008 U.S. Dist. LEXIS 39884, at *29 (E.D. Cal.

---

[11] Even if the *Apprendi* rule were applicable to consecutive sentences, it is not clear that Sullivan would prevail. Sullivan was sentenced to 96 years to life (*i.e.*, consecutive terms of 15 years to life for counts 1 through 6 and a consecutive 6-year term on count 7) -- *i.e.*, he largely had an indeterminate sentence. Some courts have held that when "a defendant is sentenced to an indeterminate term, the statutory maximum is life in prison. Additional consecutive sentences serve only to increase the statutory *minimum* sentence, which the Supreme Court has held does not implicate the Sixth Amendment." *Sandoval v. Campbell*, No. 1:05-CV-00174 AWI JMD (HC), 2007 U.S. Dist. LEXIS 81931, at *28 (E.D. Cal. Oct. 31, 2007) (recommendation) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 82 (1986)), *adopted by*, 2008 U.S. Dist. LEXIS 24308 (E.D. Cal. Mar. 26, 2008); *see also Aburto v. Campbell*, No. CIV S-06-2446 MCE GGH P, 2008 U.S. Dist. LEXIS 21529, at *25 (E.D. Cal. Mar. 19, 2008) (recommendation) (noting the same); *People v. Sengpadychith*, 26 Cal. 4th 316, 327 (2001) (holding that rule of *Apprendi* does not apply to indeterminate life sentence because nothing can increase statutory maximum).

United States District Court
For the Northern District of California

1    May 16, 2008) (stating that *Apprendi* and its progeny contain no indication that their holdings apply

2    to a judge's authority to impose consecutive sentences); *Cobbin v. Hudson*, No. 1:05 CV 2809, 2008

3    U.S. Dist. LEXIS 14735, at *6 (N.D. Ohio Feb. 26, 2008) (indicating the same); *Wright v. Adams*,

4    No. C 06-113 MHP (pr), 2007 U.S. Dist. LEXIS 80835, at *23-24 (N.D. Cal. Oct. 23, 2007)

5    (indicating the same); *Fuson v. Tilton*, No. 06-CV-0424 H (WMC), 2007 U.S. Dist. LEXIS 66977,

6    at *53 (S.D. Cal. Sept. 10, 2007) (indicating the same).  Moreover, the current lack of clearly

7    established Supreme Court precedent is substantiated by the fact that the Supreme Court recently

8    granted certiorari in *Oregon v. Ice*, 128 S. Ct. 1657 (2008), to address the issue of whether the Sixth

9    Amendment, as construed in *Apprendi*, requires that facts (other than prior convictions) necessary to

10    imposing consecutive sentences be found by the jury or admitted by the defendant.[12]

11

12         IT IS SO ORDERED.

13

14    Dated:  September 17, 2008

15                                                          _____
                                                            MARILYN HALL PATEL
16                                                          United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28         [12] This Court has previously stated that "the signals from the [United States Supreme] Court are that the [*Apprendi*] analysis is done one crime at a time and consecutive sentencing possibilities when multiple convictions for multiple crimes have occurred are irrelevant to the analysis."  *Wright*, 2007 U.S. Dist. LEXIS 80835, at *23.